### THE REUBEN DOUD.

#### HOXSIE *et al. v.* THE REUBEN DOUD.

*(District Court, E. D. Michigan. February 16, 1891.)*

SHIPPING—CARRIAGE OF GOODS—DEMURRAGE.
  Goods were shipped under an ordinary contract of affreightment, there being no bill of lading, and no special agreement to pay demurrage. On reaching port, the master refused to deliver the goods until he had been paid the freight, and also a charge for demurrage, which, even according to his own figures, was excessive. The consignee, after tendering a larger sum than what was due, notified the master that he abandoned the goods to the vessel. *Held*, that the consignee was entitled to recover from the vessel the value of the goods, less the lawful charges, since the delay was caused by the wrongful acts of the master in making an extortionate demand, and in not storing the goods in a warehouse instead of keeping them on board.

In Admiralty.

In the latter part of April, 1890, the master of the schooner Reuben Doud chartered her to carry for libelants a cargo of ice from Brockville, Ont., to Detroit, for $350, allowing three days to load at Brockville, and three days to unload at Detroit. She commenced loading Thursday, May 1st; and continued through May 2d and 3d; rested on Sunday, May 4th; resumed Monday, May 5th; finished Tuesday, May 6th. Tuesday she cleared for Detroit, arriving there Thursday, May 15th. On Monday, May 20th, the schooner was notified to go to dock for discharge. Upon arriving there, her master demanded of libelants the freight money, $350 and $450 for demurrage, before he would proceed to deliver the cargo. Libelants refused to submit to this demand, and went with the purchaser of the ice to the office of the owners of the schooner, when it was agreed that the purchaser should pay the master of the schooner for the amount of ice he took from the schooner at $3.25 per ton. The delivery was commenced, and continued till about noon, when the master stopped it, and refused to deliver any more ice until his demand was paid. Thereupon libelants tendered $350 freight and $150 for demurrage, and demanded the delivery of the ice, which was refused. Whereupon the owner and master were notified that libelants abandoned the cargo to the schooner, and would hold her for its value.

*H. C. Wisner,* for libelants.

*W. V. Moore,* for respondents.

HAMMOND, J., (*orally, after stating the facts as above.*) The contract in this case, as shown by the proof, was not a contract to pay demurrage by special stipulation, which a court of admiralty always rigorously enforces. In the case of *Fish* v. *One Hundred and Fifty Tons of Brown Stone,* 20 Fed. Rep. 201, the court considers the subject of demurrage in relation to stipulations for the delivery of the cargo; and it is there held that a court of admiralty will enforce those stipulations only when it appears to have been the intention of the parties to make a contract for a time within which the cargo should be discharged. In the absence of such special stipulation, it is the law of admiralty, as well as the common law regulating carriers, that it is the duty of the carrier to deliver the cargo speedily at the place of delivery; and, if for any reason the consignee is not ready to receive delivery, it is his duty to warehouse the goods, and in due time enforce his lien for whatever freight and charges he may have. The consignee cannot be held liable for any delay which is not the result of his fault and negligence in the premises. Now, the proof of this case certainly does not show that there was any contract between the parties that the cargo of ice should be delivered in Detroit within a fixed time. It was, at most, only a suggestion on the part of the captain that he and his owners would be liberal in the matter of giving a few more days of time than the ordinary rule of three lay-days, as understood among vessels. I think it was not a contract to do that. On the other hand, it certainly was not a contract to pay demurage at the rate of $50, or any other sum, for any delay over and above the ordinary three days allowed for what is called "lay-days." It was an ordinary contract of affreightment,

by which the vessel undertook to deliver at Detroit a cargo of ice for the sum of $350, $25 being added by consent of parties for the delay in loading the vessel at Brockville, Ont., where the ice was taken on board. There was no bill of lading setting forth the terms of the contract as is usual in such cases, and we must rely upon the ordinary obligations of a simple contract of affreightment. My understanding of the law is that in such cases it is the duty of the carrier to promptly and without delay deliver the cargo upon the payment of his charges for freight, but, if for any reason the consignee should not be at hand or ready to take delivery and pay the charges, it is nevertheless the duty of the carrier to unload and store the goods in some warehouse subject to his lien for freight charges; and it certainly never was, either at common law or in admiralty, the rule that the ship could lie by or that the train of cars could hold on to the goods and ask payment for the detention of the vessel, under the name of demurrage, of a larger warehouse charge than would be made if the goods had been stored, nor payment for the rental value of the cars in which they might be kept. Demurrage arises only where the consignee by some fault of his prevents delivery within a reasonable time, either to himself or to some warehouseman for him under the above rule, or where by the usages and customs of the port it might arise under other circumstances. It was therefore, in my judgment, the duty of the vessel, when it reached Detroit, to have promptly unloaded this cargo, and stored it in some proper place, subject to the lien for freight. There is not a particle of proof in this case showing, or tending to show, that this method of delivery was in any way obstructed, either by the consignee or by a condition of things at Detroit which made it impracticable to so store the ice. Instead of doing this, the captain and owner of the vessel proceeded upon the theory that they were entitled to demurrage at the rate of $50 a day; and at the very first appearance of the consignee made a demand upon him for the sum of $450 for demurrage, which was, even upon their own theory of being allowed $50 a day, more than they were entitled to upon any possible computation that could be made upon the facts in this case. There was not a sufficient time to entitle them to that sum, under any circumstances whatever, at the time it was made. They refused to deliver the cargo until this sum was paid, and from that time on until the end of the case, and even up to this very day of trial, there has been no mitigation or lessening of that manifestly extortionate demand. It is true that the respondents in this case busied themselves in efforts to help the libelant sell his cargo of ice, but always with the manifest purpose of keeping possession of the goods or the money until this unjust demand for demurrage should be paid. He was struggling like a fish in a net to to be rid of this claim, and was at all times seriously embarrassed in disposing of the cargo, because of the demand of more than double of that which was due to the ship which had possession. There are suspicions in the case, and it is argued, that, being a stranger in Detroit, these unjust claims were set up against him with a hope of so embarrassing him in the disposal of his cargo that the profits of the speculation should be transferred from his pockets to the pockets of the respondents. But it

is immaterial to the decision of this case to decide anything upon that subject. It is sufficient to say that the cargo was not delivered according to the contract and the obligations it imposed in the matter of delivery. This non-delivery entitled the libelants to abandon the cargo to the ship, and sue for its value, which he has done in this case; and he certainly is entitled to recover that value, unless there be something in the facts which will excuse the non-delivery.

It is true that the law of this contract imposed upon the consignee the duty of providing for the payment of the freight and charges that were due the ship, and making provision for delivery without any unnecessary delay. If he had brought with him the money agreed upon as charges for freight, and paid it over to the captain, and had his cargo unloaded, he would only have discharged his duty and obligation under the contract; but he was prevented from doing this, or making any provision for doing it, or even making any disposition of the cargo, so as to enable him to raise the necessary money, if he chose to resort to that means, by this extortionate demand that was made for a sum twice as large as that which was due. The fact that he did not tender, in the first instance, the amount that was due, and insist upon delivery, did not cause the delay; because it is manifest that that sum would not have been accepted. But if, being without the means to discharge the freight, he could not make this payment, it does not follow that the ship might lie in the harbor at its will, and eat up the value of the cargo by charges for demurrage, amounting to whatever the ship might earn if otherwise engaged. The law does not authorize the imposition of such an unjust burden upon the owner of the cargo, but, as has before been stated, directs what the carrier shall do under such circumstances. And it is only the common rule of law that where one has a claim against another for damages, such as have been described, it is his duty to mitigate and lessen those damages as much as possible by reasonable and prudent care of the property involved. The books are full of cases illustrating this rule.

Much stress has been laid upon the fact that there was not a tender of a sufficient amount due at the time the $500 tender was made; and it is said that the fact of making this tender in some way changed the relations of the parties, and that at that time the respondents can claim that the libelant is in fault for not paying the just charges, and taking his ice. My understanding is that the only effect of a tender is to relieve the one making a proper tender of the costs of litigation that may ensue upon its refusal. I do not understand that it in any sense changes the rights of the parties under the contract, or in any sense binds him who makes the tender to acknowledge that that sum or any sum is due. It might be, as a matter of evidence, taken as an admission that something was due, if unexplained; but I doubt if it could be even used for that purpose. It certainly is not a fruitful soil, out of which the respondents may grow a claim that the libelant has been at fault in not providing for the payment of the freight and demurrage on his cargo, and taking the delivery of his ice. Neither is the fact that a sale was made of

a part of the cargo, and a conditional sale of the balance, and that an order or draft upon the purchaser was given to the ship or its captain for the proceeds of the sale, a fact that shows delivery. It is manifest that that arrangement was a struggle of the consignee to release himself of the burden that had been imposed upon him and an attempt to get out of the toils. As far as it was agreed to by the respondents, it was done in the hope of realizing a sufficient sum to pay their claim, including the extortionate demand for demurrage; and a fair inference from the proof is that they broke up the sale, and prevented its completion, when they found that it would not produce enough to pay their claim, or else in pursuance of a former suggestion that they desired to still further embarrass the libelant in making a sale of his cargo at any profit to himself. At all events, that transaction shows that it was not a delivery of the cargo to the libelant, but only an effort of both parties to get rid of the cargo, and settle the disputed claims in some way subsequently. This was no fault of delay on the part of the libelant to receive delivery which would make him chargeable under the admiralty law for demurrage to the ship, and, whatever other effect the transaction may have upon the rights of the parties, it certainly does not justify any claim for demurrage, and that is all we have to do with it in this case.

The filing of the libel against the cargo by the ship-owner in this court would, under some circumstances, be treated as tantamount to a delivery; but this would only be so where the ship and its owner were without fault on their part in the matter of delivery, and where the libelant was at fault in the non-payment of just charges. His tender of $500 shows that he was able and willing at that time to discharge the lien for freight, and the libel was unnecessary, except upon the theory that the demurrage was due and demandable, which has been insisted upon all through the trial of this case. Under such circumstances, the filing of the libel cannot be treated as a delivery of the cargo under the contract of affreightment. Moreover, the rights of the libelant to abandon the cargo, and hold the ship for its value for non-delivery, had already been exercised, and had become fixed by the refusal to deliver, or, what is the same thing, the attaching to the offer to deliver the unreasonable, onerous, and extortionate conditions for the payment of charges not due. In a word, it is my judgment that the unlawful and extortionate demand for demurrage was the cause of this delay and of the non-delivery, and that the respondents were themselves, in that respect, at fault. The logical result of this judgment would be that the respondents would be allowed only their freight charges, to be deducted from the reasonable value of the cargo; but the libelant has conceded, and now concedes, a willingness to pay the sum of $150 for demurrage in addition to the $350 freight charges, making $500, which he tendered before the bringing of this suit. Solely because of that concession, and for no other reason, the court will here allow the $150 for demurrage. There is some dispute as to the amount of the cargo, but I think, allowing for possible waste, it may be put at 472 tons, and that the reasonable market price at that time was was $3.25 per ton, making the money value of the cargo $1,560; from

which, deducting the $500 allowed for freight charges, would leave the libelants entitled to a decree for $1,060, with interest from the filing of the libel. The respondents will pay the costs.